IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

TIMIE DEWAYNE WILLIAMS, )
)
)
Petitioner, )
v. ) Case No. CIV-13-558-W
)
ROBERT PATTON, Director of the )
Oklahoma Department of Corrections,[1] )
)
)
Respondent. )

## REPORT AND RECOMMENDATION

Petitioner Timie DeWayne Williams, a state prisoner appearing through counsel, has filed a petition for habeas corpus relief and a brief in support pursuant to 28 U.S.C. § 2254, ECF No. 1, (Petitioner's Brief) challenging the constitutionality of his state court conviction. Respondent has filed a Response, ECF No. 8, (Response). For the reasons set forth below, it is recommended that the Petition be **DENIED**.

### I. Relevant Case History

Petitioner seeks habeas relief based on his allegation that the assistant district attorney who prosecuted him for murder failed to disclose the existence of an agreement with a key witness, Mr. Isaac Hutchinson. According to Petitioner, the assistant district attorney offered leniency on pending charges against Mr. Hutchinson in return for his testimony linking Petitioner to the murder of Mr. Ralph Roe.

---

[1] Where, as here, the Petitioner is a state prisoner housed in a private correctional facility, the proper respondent is the Director of the Oklahoma Department of Corrections, Robert Patton.

On July 31, 2006, the State filed an information charging Petitioner with First-Degree (Felony) Murder in violation of Okla. Stat. tit. 21, § 701.7(B). Petitioner was sixteen years old at the time of the offense. On June 21, 2007, the Honorable Joe B. Reeves, Special Judge, denied defense counsel's motion to certify Petitioner as a juvenile or youthful offender, and, having found probable cause, bound him over for trial as an adult. On October 3, 2007, Case No. J-2007-680, the Oklahoma Court of Criminal Appeals (OCCA) reversed that decision and ordered the trial court to treat Petitioner as a youthful offender.

On January 24, 2008, Petitioner's first trial ended in a mistrial when the jury could not reach a unanimous verdict. Petitioner was retried on May 5-7, 2008, and was convicted of First Degree (Felony) Murder in the District Court of Comanche County, State of Oklahoma, in Case No. CF-2006-365. On July 28, 2008, the trial court entered judgment and sentenced Petitioner to life imprisonment. The charges of accessory to first degree murder, previously lodged against Mr. Hutchinson, were dismissed. Accessory charges against two other individuals, who did not testify for the prosecution, were not dismissed. Both of the non-testifying individuals so charged were ultimately sentenced to five years of imprisonment.

On appeal to the OCCA, Case No. F-2009-1136, Petitioner requested an evidentiary hearing regarding his contention that there was "newly discovered evidence" of an undisclosed "deal" between the prosecutor and Mr. Hutchinson. The State agreed that an evidentiary hearing was necessary, and the OCCA remanded the case to the trial court which held an evidentiary hearing on September 17, 2010. *See* Transcript of Evidentiary

2

Hearing, Case No. F-2009-1136 (TR. H.). On October 12, 2010, the trial court issued Findings of Fact and Conclusions of Law. *See* Response, Exhibit 5. The trial court found no evidence of an agreement between the State and Mr. Hutchinson. The OCCA affirmed Petitioner's conviction and sentence on direct appeal. *See* Opinion, Case No. F-2009-1136 (March 2, 2002) (Response Exhibit 7).

## II.  Facts of the Case

The fatal shooting of Mr. Roe, for which Petitioner was convicted, arose from an attempt by Mr. Roe to buy drugs at the Apple Run apartment complex in Lawton, Oklahoma.  On July 26, 2006, 43-year-old Mr. Roe drove his pickup truck to the Apple Run apartments. Ms. Claudia Riddle testified that she accompanied Mr. Roe on this errand and subsequently witnessed the murder.

Ms. Riddle testified that once they reached the apartments, Mr. Roe left the truck and began speaking with a young African-American girl. Ms. Riddle, who remained in Mr. Roe's truck, could not hear all of the ten-minute conversation, but she did hear Roe say something about marijuana or pot (TR. 220, 229-30).[2]  The young girl and Mr. Roe were then joined by a young African-American male. Ms. Riddle overheard the girl say the young man was her brother (TR. 221, 230). Ms. Riddle testified that she was upset with Mr. Roe because he had a "wad of money" that he was showing to "them kids." Ms. Riddle testified that she did not know if Mr. Roe "was trying to pick [the young girl] up or what." (TR. 222, 230).

---

[2] Unless otherwise noted, references are to the trial transcript.

After a brief whispered conversation, the young man and Mr. Roe got into the truck. Mr. Roe drove to a different location in the apartment complex at the direction of the young man (TR. 231-32). There, the young man got out of the truck and returned a few moments later telling Mr. Roe and Ms. Riddle, "the guy wasn't home." (TR. 221). Mr. Roe drove back to the original location, and the young man left the truck. Mr. Roe then drove away from the apartment complex (TR. 233).

After driving a short distance, Mr. Roe looked for, but could not find his cell phone. Over Ms. Riddle's objection, he returned to the parking area of the complex to search for the cell phone (TR. 221-222, 237).[3] As the truck was entering the parking area, Ms. Riddle noticed a young African-American male (she was not certain if it was the same person who had been in the truck with her just minutes before) approaching from a field (TR. 223, 237-238). Mr. Roe got out of the truck and Ms. Riddle heard the young man say, "Give me your money." (TR. 224). Ms. Riddle heard a shot and ducked. When she looked up again, the young man was gone (TR. 225). A bullet struck Mr. Roe in the right arm, passed through his biceps and entered his chest cavity (TR. 225, 354). Mr. Roe was able to drive for approximately three blocks before his truck struck a mailbox (TR. 225-226, 320). Mr. Roe told Ms. Riddle not to call police because, "I got crack on me." (TR. 226). Ignoring his instructions, Ms. Riddle summoned the police and an ambulance. Mr. Roe was taken to Comanche Memorial Hospital where he later died as a result of the gunshot wound (TR. 369-370).

---

[3] Roe's cell phone was found during an inventory search of the truck (TR. 341).

Because Ms. Riddle could not identify Petitioner as the man who shot Mr. Roe, the prosecution relied on the testimony of other witnesses. One such witness was Mr. Hutchinson, a twenty-six-year-old convicted felon and self-professed drug dealer (TR. 266-67, 274, 278). Shortly before Mr. Roe was shot, Mr. Hutchinson was on Mr. Raymond Taylor's porch selling marijuana to him (TR. 244, 267). Mr. Taylor's home was located behind, and across a field from, the Apple Run apartments, approximately 100 yards from the parking area where the shooting took place (TR. 242-243).

Mr. Hutchinson testified that Petitioner walked up to him across Mr. Taylor's yard and asked Mr. Hutchinson for a "burner" because, Petitioner stated, he was "about to hit a lick." Mr. Hutchinson defined a "burner" as a gun, and explained that to "hit a lick" meant to perpetrate a robbery (TR. 268). Mr. Hutchinson testified that he, Mr. Taylor, and a woman identified both as "Kee" and Mr. Hutchinson's "baby momma," watched Petitioner cross the field and approach a truck (TR. 267, 269). Mr. Hutchinson testified that a "white guy" got out of the truck. He then heard a "pop," after which he watched Petitioner run away (TR. 269-270).

According to Mr. Hutchinson's testimony, a man named Stanley Woods returned the gun several hours later (TR. 272). Mr. Hutchinson testified that he sold the gun to an unidentified person in Oklahoma City because he knew the police would be looking for it (TR. 272-273). But when Mr. Hutchinson was contacted by the police and learned that he could be facing serious charges, he implicated Petitioner in the murder of Mr. Roe and helped Lawton detectives retrieve the gun (TR. 273-274).

5

Mr. Hutchinson told the jury that he had been charged as an accessory for his part in Mr. Roe's murder. He claimed that he had made no deals with the prosecution in exchange for his testimony and that the prosecutor had told him to tell the truth (TR. 275, 281-82). On redirect examination, the prosecutor asked Mr. Hutchinson if he understood that he had "messed up" and that he would "have to pay for the consequences for it." Mr. Hutchinson replied, "Yes, sir" (TR. 289).

But Mr. Hutchinson, unlike Mr. Woods and Mr. Jason Turner, who were also charged as accessories to Petitioner's crime, faced no consequences. Mr. Woods and Mr. Turner both pled guilty to charges of accessory to murder and both were sentenced to five years of imprisonment.[4] The charges against Mr. Hutchinson were dismissed, but not until he had testified at Petitioner's preliminary hearing, first trial, and second trial. Charges remained pending against Mr. Hutchinson for over two years while the prosecution continued his case several times. Mr. Hutchinson's testimony tied Petitioner directly to the murder weapon and the murder itself.

### III. <u>**Ground for Habeas Relief**</u>

Petitioner contends the State violated his Fourteenth Amendment right to due process by concealing a "deal" between the prosecutor and Mr. Hutchinson to the effect that Mr. Hutchinson would receive leniency on the pending felony charges against him in return for his testimony against Petitioner. Petitioner offers circumstantial evidence to

---

[4] The Court takes notice of the information contained in docket sheets pertaining to charges lodged against Stanley Woods, Comanche County District Court, Case No. CF-2006-363; Jason Turner, Comanche County District Court, Case No. CF-2006-364; and Isaac Hutchinson, Comanche County District Court, Case No. CF-2006-369. These documents may be viewed on the Oklahoma State Courts Network, www.oscn.net.

support his theory that such an agreement existed before his second trial. He points to the delay in the disposition of the charges against Mr. Hutchinson and the subsequent dismissal of those charges as evidence that Mr. Hutchinson testified in return for the prosecutor's promise of leniency. Petitioner claims the prosecution suppressed existence of the agreement.

## IV. ANALYSIS

In 1963, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

Nine years later, the Court expanded the rule set forth in *Brady* to include impeachment evidence. *See Giglio v. United States*, 405 U.S. 150 (1972). In *Giglio*, a case involving the nondisclosure of the Government's agreement to forgo prosecution of a testifying co-conspirator, the Court applied *Brady* and held that when the reliability of a witness may be determinative of guilt or innocence, the nondisclosure by the government of material evidence relevant to the credibility of that witness violates due process and requires a new trial. A new trial in such cases is limited, however, to situations where the absence of the evidence could, *in any reasonable likelihood*, have affected the verdict of the jury. *Id.* at 154. In *Giglio,* an Assistant United States Attorney had promised the Government's key witness that he would not be indicted or prosecuted if he would testify against Giglio. The witness in question was the only witness who could link Giglio directly to

the crime for which he had been charged. The agreement was not disclosed to Giglio's counsel, and the witness did not reveal the agreement under cross examination. *Giglio* held that, because the reliability of the witness may well have been determinative of guilt or innocence, nondisclosure of the impeachment evidence violated due process and fell within the general rule set forth in *Brady* that suppression of material evidence justifies a new trial. *Id.* at 153-154.

In *United States v. Bagley*, 473 U.S. 667 (1985), the Court reiterated that the suppression of evidence, be it exculpatory evidence or impeachment evidence, is a violation of due process requiring a new trial *if* the suppression of the evidence deprived the defendant of a fair trial:

> The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as a primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. The prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial.

*Id.* at 675.

But before the principles set forth in these Supreme Court decisions are applicable, there must be proof that a plea agreement existed at or before the time of trial. In *Giglio*, for example, there was direct evidence of an agreement consisting of an affidavit filed by the Government in opposition to a motion for a new trial which contained statements supporting the petitioner's claim that an Assistant United States Attorney had promised the Government's key witness that if he would not be prosecuted if he testified before the grand jury and at trial. *Giglio* at 152-153. The fact that the Assistant United States Attorney

may not have had the authority to make such an offer and may not have informed his superiors or his associates of the offer did not change the result. The Court stated that "[a] promise made by one attorney must be attributed, for these purposes, to the Government." *Id.* at 154.

In this case, three witnesses testified at the evidentiary hearing: Rande Worthen, the Assistant District Attorney who prosecuted Petitioner, Robert Schulte, the District Attorney who claimed responsibility for dismissing the charges against Mr. Hutchinson, and Don Herring, the attorney who represented Mr. Hutchinson. According to the testimony of Mr. Schulte, Mr. Hutchinson had left the state (TR. H. 18).

Mr. Worthen testified that he "never had any discussion with [Hutchinson] or counsel concerning any deals concerning [Hutchinson's] testimony of that case. The only thing I ever mentioned to Mr. Hutchinson was to tell the truth" (TR. H. 11). Mr. Worthen offered the following explanation for the dismissal of charges against Hutchison:

> Mr. Isaac Hutchinson testified at trial. Sometime subsequent to that – and I don't even know right now why – it came to my attention that that case was still pending against Mr. Hutchinson.
>
> I went to my boss, Mr. Schulte, and asked him what I should do about that case. Mr. Schulte had no direct connection to the prosecution of Mr. Williams, but I don't dismiss cases. That's not the policy of our office and hasn't been for basically twenty-four years.
>
> So I went to Mr. Schulte, asked him what I should do with Isaac's case. He indicated, well, did he testify? I said, yes, he did, and he said, well, just go ahead and dismiss it and go ahead and get rid of that. So that's what I did. I did a court minute to dismiss that case.
>
> That's something that I would not do on my own, and that's just not a policy that was ever provided for in our office. We didn't do suspendeds or

9

deferreds during that period of time on a regular basis, and if we did, we would go either to Fred or to the first assistant or to Mr. Schulte and ask them about their thoughts before we did anything like that. So I didn't have -- it was not my direct decision to dismiss that case as to Mr. Hutchinson.

(TR. H. 10).

Mr. Schulte, the District Attorney at all times relevant to this case, also testified at the evidentiary hearing. His testimony supported that of Mr. Worthen:

> Rande came in to my office sometime after [Mr. Williams'] that case was resolved, and he said the only thing we have left pending on this case is Isaac Hutchinson. We had a brief conversation. He told me he [Hutchinson] testified for him, that he did the things he was supposed to do, and I believe, sir, as best I recall he said that he [Hutchinson] was now out of state.
>
> The policies in our office were we did not give deferreds or suspendeds on felonies. The best they could do is stand before a judge, do a blind plea, and we'd let the judge decide what the punishment ought to be.
>
> In that case, rather than go through all of that, bring him back, I told Rande to dismiss the case. Rande had not asked for a dismissal. That's what I told him to do and let's move on to the next case.

(TR. H. 18). Mr. Schulte stated that he was not aware of anyone in his office making any offer to Hutchinson (TR. H. 19). In response to another question, Mr. Schulte explained why he told Mr. Worthen to dismiss the charges against Mr. Hutchinson:

> It was a combination of things, sir. I believe he hadn't been in trouble. He had come forward, done the right thing, he had testified, and he was now out of state. So it was a combination of those things.
>
> I also think sometimes a person testifies for the State and then goes to prison, they're a marked individual, and there's always a little bit of concern about that.

(TR. H. 19).

Mr. Herring, Hutchinson's attorney, testified that Mr. Hutchinson had testified against Petitioner with the "anticipation that any cooperation he gave would be made available at the time of his sentencing." (TR. H. 21). When asked how Hutchinson came to conclude that by giving testimony he could help himself, Herring answered,

> I don't recall whether it was a conversation between myself and the district attorney's office or whether I relayed to him -- I don't have a recollection of exactly how that came about, but I know that he was under the impression that any cooperation that he gave would be made known to the court at the time of his sentencing.

(TR. H. 22). When asked whether Mr. Worthen had stated that Mr. Hutchinson's cooperation would be made known to the court at a later time, Herring testified:

> Again, I don't have a specific recollection whether Mr. Worthen said that or not. Again, I know my client cooperated with the hope that his cooperation would be taken into consideration, but whether or not Mr. Worthen – Mr. Worthen did not specifically offer any kind of a deal, and there was not any implicit deal, but I know that my client was under the hope, shall we say, that if he testified and cooperated with the State, that that cooperation would be made known at a later time.
>
> I don't have any recollection of any specific conversation between myself, Mr. Worthen and Mr. Hutchinson about that particular situation, although, like I said, I know that Mr. Hutchinson was hopeful that his cooperation would be taken into consideration.

(TR. H. 22-23).

Based on the testimony at the evidentiary hearing, the trial court found that no agreement existed between Mr. Hutchinson and the State and, therefore, there was no evidence to suppress.

> The court finds that there is no evidence of any agreement between the state and witness Isaac Hutchinson at the time of trial to provide him with some benefit in exchange for his testimony against Williams …. The court

> finds that witness Isaac Hutchinson had merely a hope that if he testified and cooperated with the state, his cooperation would be taken into consideration…. The court finds that this hope does not amount to a "deal" with the state, either expressed or implied

(Response, Exhibit 5 at 2).

Relying on the trial court's findings, the OCCA concluded that Petitioner had failed to make the threshold showing that the prosecution had an agreement with its key witness (Response, Exhibit 7 at 8).

In reviewing Petitioner's application for habeas relief, this Court is bound by the standards set forth in the Anti-terrorism and Effective Death Penalty Act of 1996 (AEDPA). Under AEDPA, this Court may grant Petitioner habeas relief only if the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Judicial review is directed to the result of the state appellate court's decision, not its reasoning. *See Gipson v. Jordan*, 376 F.3d 1193, 1197 (10th Cir. 2004) ("[W]e defer to the [state court's] decision unless we conclude that its result--not its rationale--is legally or factually unreasonable.") (internal citation and quotation omitted).

A state court's decision is "contrary to" clearly established federal law for purposes of § 2254 if "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from" the result reached by the Supreme Court. *Williams v. Taylor*, 529 U.S.

12

362, 405-406 (2000). It is not enough that the state court decided an issue contrary to a lower federal court's conception of how the rule should be applied; the state court decision must be "diametrically different," "opposite in character or nature," or "mutually opposed" to the Supreme Court decision itself. *Id*. at 406.

A state court decision involves an "unreasonable application" of federal law if "the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "AEDPA's conception of objective unreasonableness lies 'somewhere between clearly erroneous and unreasonable to all reasonable jurists.'" *House v. Hatch*, 527 F.3d 1010, 1019 (10th Cir. 2008) (*quoting Maynard v. Boone*, 468 F.3d 665, 670 (10th Cir. 2006)). "Thus, 'only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254.'" *Id*. (*quoting Maynard* at 671).

Of special significance to this Court in this case is AEDPA's requirement that factual findings of the state trial and appellate courts be presumed correct. It is the petitioner who bears the burden of rebutting this presumption by clear and convincing evidence. *See Short v. Sirmons*, 472 F.3d 1177, 1184 (10th Cir. 2006) (*citing* 28 U.S.C. § 2254(e)(1)).

In this case, Petitioner has failed to demonstrate by clear and convincing evidence that the findings of fact by the trial court are wrong. Because this Court must accept as correct the facts set forth by the trial court, the OCCA's resolution of Petitioner's direct appeal is neither contrary to, nor an unreasonable application of Supreme Court law to the

facts in Petitioner's case. It is therefore recommended that the Petition for Writ of Habeas Corpus be denied.

## RECOMMENDATION

It is recommended that the Petition for Writ of Habeas Corpus, **ECF No. 1**, be **DENIED**.

## NOTICE OF RIGHT TO OBJECT

The parties are advised of their right to object to this Report and Recommendation. *See* 28 U.S.C. § 636. Any objections must be filed with the Clerk of the District Court by **March 24, 2014**. *See* Local Civil Rule 72.1. Failure to make timely objection to this Report and Recommendation waives the right to appellate review of the factual and legal issues addressed herein. *Casanova v. Ulibarri*, 595 F.3d 1120, 1123 (10th Cir. 2010).

## STATUS OF REFERRAL

This Report and Recommendation **disposes of all matters** referred by the District Judge in this case and **terminates the referral**.

ENTERED on March 7, 2014.

_____
SHON T. ERWIN
UNITED STATES MAGISTRATE JUDGE